IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:10-CV-11-D

| | |
|---|---|
| GLENN C. MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings (DE's 23 & 27). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation (DE-29). For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-23) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-27) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for Disability Insurance ("DIB") and Supplemental Income Benefits ("SSI") on January 27, 2006, alleging that he became unable to work on December 22, 2004 (Tr. 12). This application was denied initially and upon reconsideration (Tr. 12). A hearing was

1

held before an Administrative Law Judge ("ALJ"), who found Plaintiff was not disabled during the relevant time period in a decision dated August 15, 2008 (Tr. 12-20). The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on November 21, 2009, rendering the ALJ's determination as Defendant's final decision (Tr. 1-4). Plaintiff filed the instant action on January 27, 2010 (DE-5).

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> *Id.*

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453,

2

Case 7:10-cv-00011-D   Document 30   Filed 10/28/10   Page 2 of 16

1456 (4th Cir.1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment (Tr. 14). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) degenerative disc disease at L4-5 and L5-S1; 2) post laminectomy syndrome; and 3) pain in the lower back, left foot and right hand (Tr. 14). However, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 15). Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work (TR. 15).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was unable to perform his past relevant work as an electrician (Tr. 18). However, the ALJ found that

3

there were other jobs that Plaintiff could perform and that these jobs existed in significant numbers in the national economy (Tr. 18-19). In making this determination, the ALJ relied upon the testimony of a vocational expert ("VE") (Tr. 19). Based on these findings, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision (Tr. 19-20). These determinations were supported by substantial evidence, a summary of which now follows.

Plaintiff was examined by Dr. Steven L. Friedman on January 9, 2003 (Tr. 179). He complained of numbness and tingling in his wrist, hands and fingers (Tr. 179). In addition, Plaintiff noted intermittent episodes of severe pain in his wrist, particularly with flexion and supination (Tr. 179). Dr. Friedman observed that Plaintiff had clinical findings of median neuropathy at the wrists (Tr. 179). Electrodiagnostic studies were recommended (Tr. 179). However, Dr. Friedman also noted that Plaintiff could perform light-duty work, so long as he avoided heavy lifting and strenuous gripping (Tr. 179). On February 25, 2003, Plaintiff reported intermittent numbness in his right hand, which was aggravated by repetitive activity. Plaintiff had regained full range of motion in his left little finger, and Dr. Friedman opined that Plaintiff had reached maximum medical improvement (Tr. 178). The electrodiagnostic studies demonstrated evidence of a moderate right ulnar nerve compression at the elbow and a very mild right median nerve compression at the wrist (Tr. 178). Dr. Friedman stated that these symptoms were relatively mild, and that surgical intervention was not necessary (Tr. 178). It was recommended that Plaintiff use a night splint for his elbow (Tr. 178). Plaintiff was examined by Dr. Friedman again on March 18, 2003 (Tr. 174). He stated that the night splint for his elbow did not help (Tr. 174). Again, however, Dr. Friedman noted that Plaintiff was capable of working and could use his hands while working (Tr. 174). Upon examination, Plaintiff had: 1) no fixed sensory or motor deficit present; 2) baseline and stable range of motion in his wrist; and 3) minimal wrist

tenderness (Tr. 174). Specifically, Dr. Friedman observed that while Plaintiff's wrist "was not perfect", further treatment was not indicated (Tr. 174). On April 1, 2003, Dr. Friedman evaluated Plaintiff's level of impairment related to his left finger surgery (Tr. 176-177). Other than some residual tingling, Plaintiff's finger was "doing fine" (Tr. 176). Plaintiff had full digital range of motion and the incision was well healed (Tr. 176). Dr. Friedman indicated that Plaintiff had reached maximum medical improvement and that Plaintiff had a five percent permanent and partial impairment of his left little finger (Tr. 176). Plaintiff's problems with numbness and tingling in the right upper extremity did not respond to night splinting (Tr. 177). Accordingly, Dr. Friedman recommended surgical decompression and transposition of the ulnar nerve at the elbow combined with an endoscopic carpal tunnel release (Tr. 177). On July 1, 2003, Dr. Friedman indicated that Plaintiff's symptoms were relatively well-maintained after undergoing a dorsal wrist capsulodesis (Tr. 180). Plaintiff was able to return to work as an electrician, although he gradually developed problems with numbness and tingling (Tr. 180). According to Dr. Friedman, Plaintiff did "not have any medical illnesses or outside activities, or prior subsequent trauma that could explain his ulnar neuropathy at the elbow and carpal tunnel syndrome" (Tr. 180). Therefore, Dr. Friedman opined that Plaintiff's symptoms were related to "the strenuous repetitive" activities Plaintiff performed at work (Tr. 180).

Plaintiff reported to the Columbus County Hospital emergency room on July 1, 2004, complaining of an arm injury (Tr. 197). X-rays indicated that Plaintiff's right humerus was radiographically intact (Tr. 208). Upon discharge, Plaintiff denied any further pain (Tr. 194).

From December 28, 2004 until October 20, 2005, Plaintiff underwent physical therapy (Tr. 283). The sessions were ineffective because Plaintiff violated the attendance policy, missing half of the scheduled treatments (Tr. 283, 291).

5

Dr. Brian Altman examined Plaintiff on December 29, 2004 (Tr. 273). Plaintiff stated that he twisted his back at work (Tr. 273). He also indicated that he suffered a blow to the lumbar spine (Tr. 273). Ultimately, Plaintiff experienced stiffness to the point that he was unable to continue working (Tr. 273). When he reported for examination, Plaintiff's stiffness had improved somewhat, although he still complained of pain and discomfort (Tr. 273). Plaintiff was diagnosed with a soft tissue injury to the lumbar spine and a possible L5-S1 herniated disc (Tr. 273). Dr. Altman suggested that Plaintiff not return to work for at least three to four weeks (Tr. 274).

A MRI taken on January 15, 2005 indicated that Plaintiff had L4-5 and L5-S1 degenerative disc disease with central disc protrusions (broadbased) with mild lateral recess angle stenosis (Tr. 277).

Plaintiff underwent a nerve root block on February 28, 2005 (Tr. 181). Minimal pain relief was reported after this procedure (Tr. 181). Diagnostic testing conducted that same day revealed moderate central canal stenosis and disc space narrowing (Tr. 182). A mild mass effect was also observed on the right L5 nerve root sleeve (Tr. 182). Likewise, a central disc extrusion was noted (Tr. 182-183). The extrusion was causing moderate central canal stenosis. On June 20, 2005, Plaintiff underwent a laminotomy (Tr. 184).

Sandhills Orthopaedic & Spine Clinic, PA provided treatment for Plaintiff from May 20, 2005 until November 10, 2005. On May 20, 2005, Plaintiff stated that he injured his back at work (Tr. 301). After this injury, Plaintiff complained of back and right leg pain (Tr. 301). Upon examination, Plaintiff's gait was intact and his walking was normal (Tr. 301). Plaintiff was diagnosed with lumbar degenerative disc disease and sciatica (Tr. 302). Dr. James E. Rice stated that he did not believe surgical intervention was reasonable (Tr. 302). On September 23, 2005,

Dr. Rice indicated that Plaintiff was unable to work (Tr. 300). In addition, Dr. Rice observed that Plaintiff had undergone a L4-5 bilateral diskectomy and decompression (Tr. 299). Following this procedure, Plaintiff continued to experience leg pain (Tr. 299). Plaintiff's incision was well healed and his gait was intact (Tr. 299). Dr. Rice stated that Plaintiff would benefit from completing a rigorous course of physical therapy (Tr. 299). Plaintiff returned for a follow-up on October 21, 2005 (Tr. 298). During this examination, Dr. Rice indicated that Plaintiff's symptoms had not changed significantly (Tr. 298). Specifically, Plaintiff was still experiencing back and leg pain (Tr. 298). According to Dr. Rice, Plaintiff "was not totally compliant with his rehabilitation and missed half of his appointments and was discharged" (Tr. 298). Upon examination on November 10, 2005, Plaintiff had limited range of motion (Tr. 297). He was again diagnosed with lumbar degenerative disc disease (Tr. 297).

After being rear-ended on July 1, 2005, Plaintiff reported to the emergency room, complaining of low back and hip pain (Tr. 204). He was not in acute distress (Tr. 201). X-rays of the lumbar spine revealed: 1) normal alignment of the lumbar vertebral bodies; 2) no evidence of fracture or subluxation; and 3) no evidence of an acute osseous abnormality (Tr. 209). Upon discharge, Plaintiff's gait was steady (Tr. 201).

Dr. Stephen Candela examined Plaintiff on July 29, 2005 (Tr. 278). Upon examination, Plaintiff had good range of motion in his right shoulder with no instability (Tr. 278). A MRI of Plaintiff's left shoulder on August 3, 2005 revealed degenerative changes at the acromioclavicular joint (Tr. 211). No acute process was detected (Tr. 211). On August 9, 2005, Dr. Candela suggested physical therapy to "limber . . . [Plaintiff's] shoulder up again" (Tr. 278).

On July 30, 2005, a MRI of Plaintiff's right knee was performed (Tr. 192). The MRI revealed no evidence of bone marrow edema (Tr. 192). After the MRI, Plaintiff was diagnosed

7

with: 1) a partial tear of the anterior cruciate ligament; 2) mensical degeneration without a definitive tear; and 3) prior trauma to the inferior aspect of the patella (Tr. 192).

Jason Barrier, a physical therapist, evaluated Plaintiff's RFC on November 14, 2005 (Tr. 303). Mr. Barrier ultimately determined that Plaintiff "is currently functioning in the medium category of work" (Tr. 303). Specifically, Mr. Barrier indicated that Plaintiff could: 1) occasionally 12 inch to knuckle lift 50 pounds, knuckle to shoulder lift 40 pounds, and shoulder to overhead lift 30 pounds ; 2) carry a weight of 30 pounds with two hands up to 100 feet; 3) sit "on a constant basis" for 45 minutes (Tr. 303). In addition, Plaintiff demonstrated "walking, stair climbing, sustained overhead reaching, crawling, pushing/pulling, standing, sustained and repetitive squatting, kneeling, . . . and sustained bending on a frequent basis" (Tr. 303). However, Mr. Barrier concluded by noting that Plaintiff did not meet the minimum requirements for returning to work as an electrician (Tr. 303).

Dr. Ferriss Locklear examined Plaintiff on May 24, 2006 (Tr. 227). During this examination, Plaintiff stated that the laminotomy did not improve his symptoms, and that he continues to have difficulty with chronic lower back pain (Tr. 227). According to Plaintiff, he was capable of, *inter alia*: 1) walking 1/3 of a mile; 2) standing 20 minutes at a time; 3) lifting 30 pounds (Tr. 227). Plaintiff also indicated that his right knee was "feeling much better and not really giving him any problem" (Tr. 227). Upon examination, Plaintiff: 1) had a steady gait; 2) could stand and walk on his heels and toes; 3) could squat and rise; and 4) could raise his arms above his head (Tr. 229). His strength in both his upper and lower extremities, as well as his grip strength, was 100% (Tr. 229). However, Plaintiff did have difficulty bending over (Tr. 229). Ultimately, Plaintiff was diagnosed with: 1) chronic lower back pain; 2) right lower extremity radiculopathy; 3) right knee anterior cruciate ligament tear; 4) right knee meniscal degeneration; 5)

8

history of right wrist and left ankle open reduction internal fixation; and 6) poor denition (Tr. 229).

On June 6, 2006, Plaintiff's RFC was evaluated by Dr. Dorothy Linster (Tr. 240). It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and pull with no limitations other than those already noted for lifting and carrying (Tr. 234). Plaintiff was deemed capable of frequently climbing ramps or stairs, balancing, kneeling, crouching, and crawling (Tr. 235). However, Plaintiff could only occasionally stoop or climb ladders, ropes, and scaffolds (Tr. 235). No manipulative, visual, communicative, or environmental limitations were noted (Tr. 236-237). This RFC determination was reviewed and affirmed by Dr. David Brown on November 29, 2006 (Tr. 267).

A CT of Plaintiff's lumbar spine was taken on June 8, 2006 (Tr. 316). Plaintiff was diagnosed with disc degeneration and broad based annular tears at L4-5 and L5-S1 (Tr. 316). His L2-3 and L3-4 discograms appeared normal (Tr. 316). Finally, Plaintiff had moderate central narrowing at L4-5 and mild to moderate central narrowing at L5-S1 (Tr. 316).

Another MRI of Plaintiff's lumbar spine was taken on April 6, 2007 (Tr. 318). Plaintiff was diagnosed with L4-5 posterior decompression and microdisectomy changes with epidural fibrosis/scarring surrounding the sheaths of the bilateral traversing L5 nerve roots in the bilateral recesses and a recurrent focal subligamentous right subarticular disc extrusion causing mild proximal right foraminal stenosis (Tr. 319). The MRI also demonstrated that Plaintiff had L5-S1 focal subligamentous signal abnormality, as well as right central and central disc protrusion with a possible annular tear causing mild right lateral recess stenosis (Tr. 319).

Dr. Thomas Melin examined Plaintiff on September 10, 2007. He indicated that Plaintiff

9

could return to work in a light duty capacity (Tr. 320). In addition, Dr. Melin stated that he would not place limitations on Plaintiff's standing, sitting or walking aside from frequent changes of position between the three (Tr. 320). He diagnosed Plaintiff with chronic low back pain syndrome and post laminectomy syndrome (Tr. 321). Furthermore, Dr. Melin opined that Plaintiff had reached maximal medical improvement following his first surgery, and that Plaintiff had a 12% partial permanent disability of his back due to chronic residual complaints with mild residual neurological findings (Tr. 321). During the examination, Plaintiff demonstrated good range of motion in his back and full strength in the upper and lower extremities (Tr. 322).

Plaintiff was treated at the Columbus Regional Healthcare emergency room on July 15, 2008 due to a fractured right wrist (Tr. 370). He underwent a surgical placement of a hinged external fixator (Tr. 368).

Plaintiff received treatment at the Wilmington Orthopaedic Group from February 1, 2005 until May 5, 2008. During an examination on February 1, 2005, Plaintiff was in a "mild amount of distress" (Tr. 258). He was diagnosed with right sciatica and possible nerve root impingement (Tr. 258). After an examination on April 4, 2005, Dr. Mark Foster stated that the majority of Plaintiff's complaints were mechanical in nature (Tr. 256). Dr. Foster also noted that Plaintiff had a 3% permanent partial impairment of his low back (Tr. 256). Plaintiff reported a "pressure sensation in his low back and tingling to the right foot" on April 12, 2005 (Tr. 255). He was diagnosed with mechanical low back pain and right lumbar radiculopathy (Tr. 255). A L4-5 decompression with bilateral L4-L5 diskectomy was scheduled for June 20, 2005 (Tr. 254). After his surgery, Plaintiff initially reported slow improvement (Tr. 253, 353). Plaintiff was encouraged to walk up to two miles daily (Tr. 253). On July 26, 2005, Plaintiff was advised to engage in a physical therapy program to improve his low back strength and endurance (Tr. 252).

Dr. Foster prescribed "aggressive" physical therapy for Plaintiff on August 4, 2005 (Tr. 348). This physical therapy was to include stretching, strengthening and aerobic conditioning (Tr. 348). During a September 13, 2005 examination, Plaintiff indicated that he was "overall doing well" (Tr. 251). Dr. Foster noted on November 28, 2005 that Plaintiff had no change in symptoms and that overall, Plaintiff's surgery had been beneficial (Tr. 250). In addition, Dr. Foster stated that Plaintiff could return to work (Tr. 250). Specifically, Dr. Foster stated that Plaintiff could occasionally lift up to 75 pounds (Tr. 250). Finally, Dr. Foster opined that Plaintiff had a 10% permanent partial impairment of his low back (Tr. 250). On March 15, 2006, Plaintiff complained of back pain (Tr. 221). A radiology report dated April 17, 2006 indicated that Plaintiff had postoperative and chronic/degenerative changes (Tr. 222). No focal disc herniation was detected (Tr. 222). Finally, there was bilateral exit foraminal encroachment due to degenerative changes and bulging annulus fibrosis (Tr. 222). Dr. Foster stated that he had a "lengthy conversation" with Plaintiff regarding disc replacement surgery on April 25, 2006 (Tr. 220, 248). A diskogram was scheduled for June 8, 2006 (Tr. 246). The discogram revealed abnormal disc morphology and concordant pain at L4/5 and L5/S1 (Tr. 245). Dr. Foster opined that Plaintiff could benefit from a two level anterior instrumentation and interbody fusion from L/4 to the sacrum for treatment of his discogenic low back pain (Tr. 245). Furthermore, Dr. Foster stated that Plaintiff was not capable of performing the duties of his job as an electrician (Tr. 245). Plaintiff reported ongoing back pain on July 26, 2006 (Tr. 244). He was diagnosed with: 1) impingement syndrome left shoulder; and 2) lumbar degenerative disc disease (Tr. 244). Dr. Foster indicated that Plaintiff now had a 15% permanent partial impairment of his low back (Tr. 244). Although, Plaintiff could not perform his essential duties as an electrician, Dr. Foster stated that Plaintiff could perform "light duty or office type work" (Tr. 244). On September 12, 2006,

Dr. Foster described a mass on Plaintiff's left posterior superior shoulder (Tr. 345). A MRI was scheduled to evaluate the mass (Tr. 345). Dr. Foster reiterated his opinion that Plaintiff could not return to work as an electrician on February 16, 2007 (Tr. 337, 340). This opinion was slightly revised on April 23, 2007, when Dr. Foster indicated that Plaintiff could return to work if certain limitations were imposed (Tr. 335). Plaintiff was re-evaluated on October 22, 2007 (Tr. 331). He was diagnosed with: 1) lumbar degenerative disc disease; 2) low back pain; and 3) left shoulder dysfunction (Tr. 331). It was noted that Plaintiff should take Vicodin and Tylenol as needed to control his pain (Tr. 331). On February 6, 2008, Plaintiff complained of left shoulder pain with swelling (Tr. 327). Dr. Foster again diagnosed Plaintiff with low back pain and left shoulder dysfunction (Tr. 327). Plaintiff was prescribed Prozac in an attempt to reduce Plaintiff's reliance on narcotics (Tr. 325, 382). Finally, on May 5, 2008, Plaintiff reported no change in his overall symptoms (Tr. 380). He was able to ambulate without assistance as well as sit squarely for short periods (Tr. 380).

During the hearing in this matter, Plaintiff testified that he had permanent nerve damage due to the compression of the disk sitting on the nerve for a long period of time (Tr. 29). He stated that this condition causes "tingling" and his legs to "give out" (Tr. 30). Specifically, he testified that standing or walking long distances causes his legs to "give out" (Tr. 30). In addition, he indicated that he takes Paxil and Percocet for pain (Tr. 33). According to Plaintiff, the Paxil makes him nervous, jumpy and moody (Tr. 33). However, he stated that the Percocet usually did not cause any side effects (Tr. 33). Plaintiff noted that he could walk for 20 or 30 minutes (Tr. 34). Likewise, he stated that he could sit and stand without changing position for 20 or 30 minutes (Tr. 34, 40). Furthermore, Plaintiff testified that he could only lift 10 to 15 pounds (Tr. 35). On a typical day, Plaintiff plays with his four children, does light housework, and watches

12

about two hours of television (Tr. 35-37). He generally prepares his own meals (Tr. 36). Plaintiff provides some care for a child with cerebral palsy as well (Tr. 37). During his testimony, Plaintiff also alleged that he could not reach overhead (Tr. 40).

With regard to Plaintiff's testimony, the ALJ made the following observations:

> The claimant testified that he continues to experience back pain. Standing and walking long distances cause his leg to buckle. He is able to walk for up to 30 minutes but then he starts to feel burning and tingling in his leg before it gives out. He then must sit for 20-30 minutes. His reported activities of daily living include getting up at 6 a.m., fixing bottles for his baby, helping with the dishes, and trying to vacuum. He also fixes lunch, plays with his children, reads and watches television. His youngest child has cerebral palsy. Although a nurse helps care for her during the day, the claimant and his girlfriend switch off taking care of the baby at night.
>
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.
> (Tr. 17-18)

Based on this evidence, the ALJ made the following finding with regard to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant must have the option to sit or stand at thirty-minute intervals as needed. He is unable to reach overhead with the left upper extremity and is unable to perform any climbing. He may occasionally crouch, crawl, and balance, and is unable to work in exposure to hazardous conditions such as machinery or heights.
> (Tr. 15-16).

Finally, a VE testified that there were jobs in the national economy which Plaintiff could perform (Tr. 19, 42-46).

The Court hereby finds that there was substantial evidence to support each of the ALJ's

13

conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claims are without merit. The undersigned will nonetheless address portions of Plaintiff's specific assignments of error.

**The ALJ properly addressed Plaintiff's worker's compensation claim**

Plaintiff claims that the ALJ erred because he did not consider Plaintiff's worker's compensation claim. Although Plaintiff argues that the ALJ did not consider Plaintiff's worker's compensation benefits in his evaluation of Plaintiff's case, Plaintiff does not cite to any evidence in the record (either from the worker's compensation commission or any other state agency) that he, in fact, received approval for these benefits. Plaintiff testified that at the time of the hearing he was receiving worker's compensation benefits (Tr. 27-28). However the record does not contain any testimony or documents detailing the nature of the claim. Thus, there was no disability decision for the ALJ to give weight to, review, or analyze. Moreover, the ALJ fully and properly analyzed all medical evidence which would have supported Plaintiff's worker's compensation claim.

In addition, even where another governmental agency issues an opinion that a plaintiff is disabled under that entity's own disability standard, the Commissioner is not bound by such

14

disability decisions, as he has the final determination on whether an individual is or is not disabled based on the entire record. *See* Social Security Ruling (SSR) 06- 03p, 2006 WL 2329939 (S.S.A.). *See* 20 C.F.R. §§ 404.1504, 416.904 (stating that "a determination made by another agency [e.g. Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on [the Commissioner]").

Therefore, this assignment of error is without merit.

## **The ALJ properly assessed Plaintiff's credibility**

Plaintiff also challenges the ALJ's determination regarding the credibility of Plaintiff's testimony. The ALJ's findings with regard to Plaintiff's subjective complaints have already been summarized. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ's findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility. Likewise, the ALJ's citations to Plaintiff's medical records constitute substantial evidence which support his assessment. Accordingly, this assignment of error is meritless.

**Conclusion**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-23) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-27) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Thursday, October 28, 2010.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE